1

**SCHIAN WALKER, P.L.C.**
3550 NORTH CENTRAL AVENUE, #1700
PHOENIX, ARIZONA 85012-2115

2

TELEPHONE: (602) 277-1501
FACSIMILE: (602) 297-9633

3

E-MAIL:  mwalker@swazlaw.com
SCOTT R. GOLDBERG, #015082

4

CODY J. JESS. #025066
Attorneys for Debtor

5

6

**UNITED STATES BANKRUPTCY COURT**

7

**DISTRICT OF ARIZONA**

8

9

In re:

Case No. 2-10-bk-32577-RJH

10

DMCT, L.L.C., a Delaware limited liability
company,

Chapter 11

11

Debtor.

**VERIFIED SUPPLEMENT TO MOTION TO
SELL SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS AND TO ASSUME AND
ASSIGN CERTAIN CONTRACTS AND
RELATED LIABILITIES**

12

13

DATE:  December 2, 2010

14

TIME:  9:00 a.m.
LOCATION:  230 North First Avenue

15

Phoenix, Arizona
Courtroom 603, 6th Floor

16

17

        DMCT, L.L.C. (the "**Debtor**"), hereby files this Verified Supplement to its *Motion to Sell*

18

*Substantially All of Debtor's Assets and to Assume and Assign Certain Contracts and Related Liabilities*

19

(the "**Motion**") [DE 25].  This Supplement is supported by the attached Memorandum of Points and

20

Authorities and the entire record in this case.

21

        DATED this 1st day of December, 2010.

22

                                        SCHIAN WALKER, P.L.C.

23

24

                                        By /s/ SCOTT R. GOLDBERG, #015082
                                            Scott R. Goldberg

25

                                            Cody J. Jess
                                            Attorneys for Debtor

26

## MEMORANDUM OF POINTS AND AUTHORITIES

1.     <u>Overview</u>. Except for its trade-name, and goodwill, which is derived entirely from the reputation of its principals, the Debtor has no net assets to sell. Its fresh egg contracts have a net liability of $70,478. Its inventory of frozen eggs lacks value. The frozen eggs cannot be sold to other frozen egg banks because of genetic risks that cannot be insured or mitigated. Furthermore, in its only year of operation, the Debtor had a taxable loss of over $400,000. Because of the Debtor's poor financial condition, its lack of operating history, and lack of assets, the Debtor was not able to attract new capital or new equity investments. It was also true that the Debtor could not attract new money while the Marco Messina ("**Messina**") litigation was pending, since investors did not want their capital used to pay attorney's fees. The Debtor filed bankruptcy as a last resort when a settlement with Mr. Messina could not be reached.

2.     <u>Initial Purchase Price</u>. The initial cash outlay of the purchase price was $15,000 plus the assumption of liabilities of $70,478.00. These terms were negotiated at arms-length between 21st Century Opportunity, Inc. (the "**Buyer**") and the Debtor. After the initial purchase price was fixed, the United States Trustee (the "**UST**") expressed concerns about the sale, but indicated that its concerns could be ameliorated if undisputed unsecured claims were paid in full. As a result, the initial purchase price, which had been fixed, became flexible within limits. The Debtor never had any intent to dictate which creditors would or would not get paid from the sale proceeds. In an attempt to address the UST's concerns, the Buyer negotiated with the holders of unsecured claims to compromise their claims in exchange for prompt payment. These negotiations are addressed in paragraph 3 below.

3.     <u>Assumption of Claim Liabilities</u>. There are only seven undisputed unsecured claims in this case that are not held by insiders: (1) Bluegrass Fertility Clinic ($15,835.00); (2) Catalyst Computer Technologies ($5,557.00); (3) Clearview Management Consulting ($17,500); (4) Frederick Lemberg ($6,000.00); (5) Greenberg Traurig ($567.00); (6) Verizon Wireless ($714.00); and (7) Canon Financial Services ($422.00). Conditioned upon approval of the Motion, the Buyer has assumed the

-2-

1  obligations for payment of claims (1) through (4) or has agreed to purchase claims (1) through (4)

2  above. In addition, contingent upon approval of the Motion, the Buyer has also reached an agreement

3  with Mr. Messina to resolve his disputed claims against the Debtor. Therefore, the total undisputed

4  unsecured non-insider debt in this case is represented by claims (5) through (7) above, and totals only

5  $1,703.00. The only other claim in this case is the administrative claim of the Ombudsman. The Buyer

6  has agreed to pay the Ombudsman $5,000 for his services.

7          4.      Liabilities of Fresh Egg Contracts. The Debtor generates revenue by matching

8  fresh egg donors with recipients. With respect to these matching services, the "fresh eggs" from the

9  donor are removed and transferred to the recipient through a surgical procedure. Presently, there are

10  fourteen (14) fresh egg donor contracts "in progress" that the Debtor intends to transfer to the Buyer.

11  These fourteen "in progress" contracts have projected revenues of $70,000 and projected expenses of

12  $96,963, for a net loss of $26,963. In addition to this loss, the Buyer will be assuming the Debtor's

13  remaining liabilities under "completed" fresh egg contracts. These liabilities total $43,515.00. As a

14  result of the proposed transaction, with respect to the completed and "in progress" fresh egg donors

15  contracts, the Buyer will be assuming net liabilities of $70,478.

16          5.      Value of the Frozen Eggs. Aside from its matching fresh donor egg services, the

17  Debtor also generates revenue through "retail" sales of the frozen eggs. The Debtor sells six frozen eggs

18  per retail sale at a gross sales price of about $12,000. The cost of goods sold for each sale is about

19  $6,000 to $8,000 (or about $1,000 per egg), so that on average, the Debtor nets about $6,000 per retail

20  sale, minus certain "replacement costs." The replacement costs, which average about $2,000 to $3,000

21  per sale, are incurred when the purchased egg(s) cannot be used for any numbers of reasons. In that

22  case, the Debtor provides "replacement" eggs without charge. After estimating replacement costs, the

23  Debtor has a net profit of about $3,000 per retail sale of frozen eggs. Presently, the Debtor has about

24  twelve (12) retail frozen egg sales remaining in its inventory. Because the frozen eggs have already

25  been purchased, the Debtor may be able to generate revenues there-from of $144,000.

26

-3-

1        6.      Market Value of Frozen Eggs.  In reality, however, the market value for the

2    Debtor's frozen eggs is zero.  The sale of frozen eggs is a nascent industry and is a rare event in the

3    United States.  The frozen eggs cannot be sold to other "frozen egg banks" because there is no ability to

4    ensure or insure that the Debtor's frozen eggs were properly screened, tested, and stored.  No buyer

5    would incur or assume such a potential liability because the liability cannot be insured or mitigated

6    through other means.  Accordingly, the frozen eggs can only be sold to recipients in twelve individual

7    sales transactions.  The Debtor estimates that it may take two or more years before its frozen egg

8    inventory can be sold to twelve recipients.

9        7.      Equity Interests in the Buyer.  Currently, the Debtor is controlled through a 60%

10   membership interest that Ms. Thomas holds through an entity called X and Y Consulting, Inc.  The

11   Buyer, in contrast, is owned by Shari Weiss though a 73.03% membership interest she owns in another

12   entity. Ms. Weiss has never had, and presently does not have a direct or indirect membership interest in

13   the Debtor, and she has never been an officer or director of the Debtor.  Furthermore, RTML, L.L.C.,

14   which had a 20% membership interest in the Debtor, will not have any interest in the Buyer.  Ms.

15   Thomas is losing all control over a company that she has spent the past fifteen years developing.  She is

16   also forfeiting repayment of the $49,000 in loans she made to the Debtor within the past year.

17       8.      Pre-Bankruptcy Marketing Efforts.    The Debtor engaged in very serious

18   marketing efforts to avoid a bankruptcy filing for the purpose of conducting a bankruptcy sale.  It sought

19   to merge with Integrated Specialty Health Care Services, Xyterm Sperm Bank, California Cryobank, and

20   Reproductive Biology Associates.  It also sought to raise additional equity from its present members.  It

21   retained Catalyst Business Development, Inc. to help raise equity or start-up capital.  In addition to these

22   efforts, the Debtor sought business loans from Home National Bank, Arizona Bank, National Bank of

23   Arizona, Biltmore Bank, Sunrise Bank, and Wells Fargo Bank.

24       9.      Publication Notice of the Sale.  The Debtor solicited offers for the proposed

25   acquisition by publishing notice of the sale in the Arizona Business Gazette.  The Debtor solicited offers

26

-4-

1  despite the following facts: (i) there is no market for the Debtor's frozen eggs, (ii) the value of the

2  Debtor's fresh egg contracts is a negative $70,478.00, (iii) the Debtor had a substantial net operating loss

3  in its only year of operations, and (iv) any buyer would be required to comply with Bankruptcy Code

4  § 332 by demonstrating ample ability to comply with federal and state regulations. As set forth in the

5  publication notice, offers were to be received no later than November 29, 2010. To date, no inquiries or

6  offers were received.

7        10.    Notice of the Motion to Donors and Recipients. The donors under the current

8  fourteen fresh egg contracts and their corresponding recipients have received notice of the Motion. The

9  notice provided that a copy of the Motion could be obtained by contacting the undersigned counsel. In

10  addition, the Debtor proposes to serve any order approving the Motion upon all interested parties and

11  provide them with an additional objection period of fifteen (15) days before the order becomes final and

12  binding upon them.

13        11.    Conclusion. The Debtor believes that all creditors will support the sale. The

14  Debtor also believes that notice of the sale has been adequate under the circumstances, and is clearly in

15  the best interest of its creditors and more particularly, is in the best interests of the donors and recipients

16  that are subject to the fourteen (14) fresh egg donor contracts. Without this sale, those contracts

17  probably could not be performed by the Debtor. The Debtor also believes that the Buyer will adopt the

18  Debtor's policies and procedures, which comply with all applicable regulations concerning safety,

19  privacy, and the confidentiality of personal information.

20        DATED this 1st day of December, 2010.

21                                      SCHIAN WALKER, P.L.C.

22

23                                      By /s/ SCOTT R. GOLDBERG, #015082
                                          Scott R. Goldberg
24                                         Cody J. Jess
                                          Attorneys for Debtor
25

26

-5-

| | |
|---|---|
| 1 | COPY of the foregoing<br>e-mailed this <u>1st</u> day |
| 2 | of December, 2010 to: |
| 3 | Edward K. Bernatavicius, Esq.<br>United States Trustee |
| 4 | 230 North First Avenue, #204<br>Phoenix, Arizona 85003-1706 |
| 5 | edward.k.bernatavicius@usdoj.gov |
| 6 | Michael St. Patrick Baxter, Esq.<br>Covington & Burling, LLP |
| 7 | 1201 Pennsylvania Avenue, NW<br>Washington, DC 20004-2401 |
| 8 | Consumer Privacy Ombudsman<br>mbaxter@cov.com |
| 9 | Shane D. Buntrock, Esq. |
| 10 | Rowley Chapman Barney & Buntrock<br>63 East Main Street, #501 |
| 11 | Mesa, Arizona 85201-7436<br>Attorneys for Marco Messina |
| 12 | buntrock@azlegal.com |
| 13 | /s/ JULIE LARSEN |
| 14 | 148935.5 |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |

-6-

**VERIFICATION**

1

2        I, Diana Thomas, authorized representative of the Debtor, declare under penalty of

3  perjury, that I am acquainted with the facts and being first duly sworn, verify on information and belief I

4  have read the foregoing *Verified Supplement to Motion to Sell Substantially all of the Debtor's Assets*

5  *and to Assume and Assign Certain Contracts and Related Liabilities* and know the contents thereof; that

6  the facts stated therein are true and correct to the best of my knowledge, and I believe them to be true.

7        DATED  *12 - 1 - 2010*                .

8                                DMCT, L.L.C.

9

10                               By *Diana Thomas*                
                                      Diana Thomas

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-7-